[L. A. No. 15217. In Bank.—November 26, 1935.]

CITY OF LONG BEACH (a Municipal Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and VERLIN K. AGAL, Respondents.

George W. Trammell, Jr., City Attorney, Harlan V. Boyer, Assistant City Attorney, Walhfred Jacobson, Deputy City Attorney, and Edmund J. Callaway for Petitioner.

Ray L. Chesebro, City Attorney (Los Angeles), Frederick von Schrader, Assistant City Attorney, and Floyd S. Sisk, Deputy City Attorney, as *Amici Curiae* on Behalf of Petitioner.

Everett A. Corten and Calvin E. Woodside for Respondents.

THE COURT.—This is a proceeding in *certiorari* praying for the annulment of an award made by the Industrial Accident Commission in favor of appellant, Verlin K. Agal, and against the City of Long Beach. Upon said *certiorari* proceeding the matter was carried to the District Court of Appeal, Second Appellate District, Division Two, and that court, speaking through Stephens, P. J., annulled the award. The matter is now before this court upon petitions filed by the Industrial Accident Commission and Verlin K. Agal, respectively, praying for a hearing, which was duly granted, from said order of annulment and asking for an affirmance of the award as made by the commission.

The theory upon which the award was made by the commission was that the applicant, who received three bullet wounds in his body at the hands of an unidentified bandit, was then and there acting as a police officer of said city, and as such officer is entitled to be compensated by said city by virtue of the provisions of the state workmen's compensation, insurance and safety laws and the statutes of this state. The shooting of applicant Agal, upon which his claim for compensation is based, took place at approximately 9:30 A. M., May 22, 1934, in the circumstances which will hereafter be related. Without observing accuracy as to the order in which the dangerous wounds were inflicted, they may be described as follows: One pistol bullet passed through applicant's left forearm; a second entered the right thigh and was removed; the third passed through the abdomen, cutting a large gash in the liver in its course.

█ The sole question presented by the appeal is whether the commission's finding to the effect that the applicant was an employee of said City of Long Beach at the time the vicious assault was made upon him, and thereby entitled to industrial compensation, is sustained by the case presented. We are of the view that as a matter of law the award must be annulled, notwithstanding the strong appeal for relief which the undisputed facts would amply justify if the city could, as a matter of law, be said to be applicant's employer. The efforts exhibited by applicant Agal to satisfy himself as to the identity of two strangers who had parked their car near the Farmers' and Merchants' Bank Building in said city and who, by their furtive appearance and manners and by the fact that the rear license plate on their automobile was bent in such fashion as to make the number of their car difficult to read, attracted applicant's attention, are of themselves evidence of those qualities which are necessary to constitute a competent and brave officer of the law, and render his situation exceedingly regrettable. His strong suspicion that said two strangers were marauding criminals proved to be well founded. In fact, he diagnosed the situation perfectly. It turned out that said two strangers who were accosted by applicant and Sergeant Edward Johnson, a police officer of the City of Long Beach, as they stepped from the elevator exit to the sidewalk, were returning from the commission of a robbery which they had committed but a few moments before in a business office on the tenth floor of the building from which they emerged. Neither applicant Agal nor policeman Johnson were aware of this robbery at the time they encountered the bandits.

The facts upon which applicant relies as sufficient to sustain the award may now be considered. On the day applicant received his wounds he was and had been for some time prior thereto an employee of the J. B. Worley Detective Agency, a private agency operating in the City of Long Beach. His attention was directed to the bandits, while in said employment, at about 9:30 o'clock in the morning as he passed the car in which they were sitting. Both appeared to be nervous and were scrutinizing him as he walked close to the car in which they were sitting and looked in upon them. He observed the unusual condition of the license plate and felt convinced that it had been designedly tampered with for "get-

away'' purposes. He then proceeded to a near-by telephone and called up Captain Worley, the head of the detective agency which employed him. He told him of the presence of the two suspicious characters and gave it as his belief that they were preparing to ''stick up the bank or pull some job''. The bank was near by the place where they had parked. Captain Worley replied that he was unable to get away but instructed applicant, to quote his language, ''to get hold of the police and, if you can assist them in any way, why do so''. Applicant hurried back to the place where the car was parked and observed that one of its occupants had gotten out and was nervously looking up and down the street. Finally, the other got out of the car and walked rapidly toward, and entered the Farmers' and Merchants' Bank Building. Applicant, observing police officer Hill across the street, hailed him and related his suspicions as to the two strangers and ''suggested that they ought to look them over''. They then went to the car and Hill raised the door of the luggage compartment and observed that it contained a rifle. Hill, upon coming to the sidewalk where applicant stood, told him that the automobile contained a rifle and remarked that it didn't look good to him. Applicant said that if he had seen the two fellows who got out of the car it would have looked even worse to him. Hill then said to him, ''You keep an eye on that car and I will go in and telephone to the station.'' Officer Hill and applicant took a position against the building near the car and in a few minutes Sergeant Johnson of the city police force arrived. All agreed that Hill, who was in uniform, should not be present when the bandits returned. Not more than two or three minutes after Hill had left, the two men came out of the building and applicant informed the officer of their approach. As they reached a point in front of said bank building, they suddenly halted and the driver of the car went north toward the parked car, while the other man turned southerly. Applicant remarked to officer Johnson, ''I think we are in for a jam.'' With this he started in pursuit of the bandit who had turned in a southerly direction and upon passing him a few feet the bandit suddenly turned and headed in the direction of the parked car when he was overtaken by applicant who grabbed him by his coat sleeve, turned him around and pulling out his badge, said, ''I would like to check on you, buddy.'' The bandit shook his right hand free and

said, "I don't need to be led." Having gained the freedom of his right arm he thrust his hand down under his sweater, and applicant, becoming suspicious that he was reaching for his arms, undertook to draw his pistol, but discovered that he had left it at his home and that he was absolutely unarmed. He then reached for his "sap" or club as he saw the bandit drawing his pistol from beneath his sweater, and struck at the bandit, but he warded off the blow by throwing up his arm and the blow fell lightly on the bandit's chin. The bandit closed in, and, pressing his gun close to applicant's stomach, shot him through the stomach, exclaiming as he fired: "Take that, you rat." The other two shots were fired in rapid succession and the bandit and his partner in crime both made good their escape.

It is the claim of the City of Long Beach that the finding by the commission that applicant, Verlin K. Agal, was an employee of said City of Long Beach on May 22, 1934, and that said injuries sustained by him arose out of or occurred in the course of his employment by said city as special police officer or as an employee in any capacity or at all is not sustained by the evidence and is contrary to law. In addition to the facts above set forth there may be added others which applicant stresses, as amounting to convincing proof that he was an employee of said city but which, it will be found upon examination, whether considered singly or in connection with the context of his testimony, fall far short of establishing a case of compensatory liability. Prior to the hour at which he was instructed by the head of the private detective agency, his employer, to report the presence of said suspects to the city police officers and to give them *any assistance* that he could render, he had not been in the employ of the city, except that some five years prior to May 22, 1934, he served a former city manager for a period of six months in the capacity of investigator, but admittedly he was not an employee of said city at the time he was injured, unless it can be said that the conversations had with the officers under the instructions of his employer amounted to a contract of employment. He cannot qualify as an officer or as an employee of the city by force of any of the several provisions of law cited and relied upon, or by the authority of any decision of this state construing the law, even if strained to the utmost limit. In reporting the presence of the suspects to his employer rather than to the

police department, the applicant was, no doubt, moved by the desire that credit for the discovery and apprehension of the suspected criminals should be given to the detective agency of which he was an employee. That applicant expected the agency would act independently of the local police is given emphasis by the fact that he requested or suggested to his employer that he assist him in completing his investigation. The employer being otherwise engaged, he instructed him to report the matter to the local police and to give them such assistance as he could render. In what we have here said it is not intended to deprecate the motives of applicant in the slightest degree. While it shows commendable loyalty to his employer it also tends to prove that he owed the peace officers of the city no official allegiance.

Other portions of the conversations which he had with Officers Johnson and Hill on the day of the shooting, heretofore noticed, and which applicant would interpret as conferring official authority upon him, cannot be so construed. In fact, he took an active and leading part in directing the investigation. He was obeying his employer's instructions. The suspects were not under arrest as they had not committed any violation of law known to the officers or applicant. He initiated the investigation. The investigation was in line with his training as a private detective, and he was the first to suggest that the strangers be "looked over", which meant that they should be stopped and questioned as to their business and identity. At the time he related his misgivings concerning the suspects to Officers Johnson and Hill, Johnson (quoting applicant's words) "said to him to stay and we will probably shake these birds down—something to that effect". As the two bandits came out of the bank building and separated, applicant said to Johnson, "I think we are in for a jam." He then started south and undertook to do what he had suggested at the outset, to "look them over", or "shake them down". His first words to the bandit whom he halted were that he would like to "check" on him.

Applicant testified that he thought the man he intended to check on was trying to make a getaway and his first thought was to trail him and see where he was going. There is nothing in the testimony of applicant that would justify the finding that he was impressed into public service by anyone clothed with official authority, nor is there any evidence to

warrant a finding that an official demand was made upon applicant to assist in the arrest of either of said suspects. In fact, it is not claimed that any attempt at arrest was made. Neither the applicant nor the officers of the law had any reason to believe that the suspects had committed any specific offenses, nor did any of the grounds set forth in section 150 of the Penal Code, which empowers "any sheriff, deputy sheriff, coroner, constable, judge, or justice of the peace, or other officer concerned in the administration of justice", to organize a *posse comitatus* or to impress into service any male person above the age of eighteen years in the prevention of a breach of the peace or any criminal offense, exist. No such extraordinary situation which justifies action under the provision of the Penal Code confronted the constabulary. In fact, one peace officer had been dismissed from the investigation because he was in uniform.

It is very clear from the record that there was no deputization by the local peace officers, or any occasion to do so. The fact that the officer asked him to keep his eye upon the men and the automobile while he went to the telephone was not an extraordinary request and is one that an officer may have properly made of any citizen who happened to be near by.

Our conclusion as above announced renders it unnecessary to decide whether or not section 159 of the charter of Long Beach has any application to or is germane to the question here presented. It provides that the "city manager may appoint additional patrolmen and officers for temporary service and that no person shall act as special policeman, or detective, or other special officer for any purpose whatsoever, except upon written authority from the city manager. Such authority shall be exercised only under the direction and control of the chief of police, and for a specified time."

Its provisions are merely regulatory of the method by which appointments shall be made and it was not intended thereby to abridge or conflict with the general laws of the state enacted for the purpose of suppressing riots or for the prevention of threatened breaches of the peace when such tumultuous occasions arise as are within the contemplation of sections 150 and 723 of the Penal Code.

We find nothing in *County of Monterey* v. *Industrial Acc. Com.*, 199 Cal. 221 [248 Pac. 912, 47 A. L. R. 359], that helps applicant. The facts in that case basically differ from those

which make up the instant case. There the applicants were the widow and the daughter of one N. H. Rader, who was commandeered into service by the sheriff of the county of Monterey against his protest under the following circumstances: "He, [decedent] had attended a meeting of a fraternal organization on the night of July 6, 1925, and was returning to his home at about the hour of eleven o'clock, at which time he was commandeered by the sheriff of Monterey County, who was then organizing a party of officers for the purpose of apprehending and placing under arrest certain violators of the Wright or Volstead Acts who were criminally connected with landing or seizing by force a cargo of intoxicating liquors, and who had earlier in the evening, while engaged in said unlawful enterprise, fired upon the sheriff's deputies, and were lurking under cover of night at or near Moss Landing, said county, to join said party of officers in the pursuit of said violators of the law. The sheriff, as he was about to depart for Moss Landing, observed the presence of N. H. Rader, and commanded his services. The party then consisted of the sheriff, a regularly appointed deputy sheriff, and the chief of police of the city of Salinas. The sheriff had been in search of the constable of Salinas township to complete his aide but being unable to find him mustered said Rader into service in his stead. A firearm furnished by the deputy sheriff was placed in the hands of Rader. Upon arriving at the objective spot at about twelve o'clock midnight, the party or posse was divided into two groups. While they were in the act of being stationed at certain points to block the avenues of escape and to await the coming of day, they were viciously fired upon by the persons whom they were attempting to place under arrest, who were armed with machine-guns, with the result that a bullet fired from a machine-gun operated by said persons pierced the heart of Rader and he was instantly killed."

All of the California authorities cited by applicant are reviewed in the above cited case, but none supports him as to the point that the City of Long Beach, in the circumstances of the instant case, was his employer. If he was a deputy sheriff of the county of Los Angeles, as intimated, his claim should have been against said county. Unquestionably, he was in the employ of the Worley Detective Agency, engaged

in performing the services of a private detective in obedience to his employer's orders, at the time he was wounded.

We are not able to find a ground upon which liability against the city can be fairly placed. Our conclusion, therefore, is that the order of the District Court annulling the award made against said city was properly made as a matter of law, even though placed on different grounds from those herein assigned.

The award is, therefore, annulled.